**UNITED STATES of America,
Plaintiff,**

**v.**

**CUSTER CHANNEL WING
CORPORATION**

and

**Willard R. Custer, Defendants.**

**Misc. A. No. 399.**

United States District Court
D. Maryland.

Nov. 12, 1965.

483

Thomas J. Kenney, U. S. Atty., Robert W. Kernan, First Asst. U. S. Atty., Baltimore, Md., Clarance E. Beaver, Washington, D. C., for plaintiff.

Vincent L. Gingerich, Takoma Park, Md., and Keith L. Seegmiller, Washington, D. C., for defendants.

WINTER, District Judge.

By final judgment in Civil No. 13500, entered May 25, 1962, defendants, Custer Channel Wing Corporation (hereafter called "Channel Wing") and Willard R. Custer (hereafter called "Custer"), were permanently restrained and enjoined from directly or indirectly making use of any means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or sell the capital stock of Channel Wing unless and until a registration statement had been filed with the Securities and Exchange Commission in regard thereto. Excepted from this main command were any securities exempted by § 4 of the Securities Act of 1933, as amended, 15 U.S.C.A. § 77d, from the necessity of registration. Thus, defendants were enjoined from using the means of interstate commerce and from using the mails to sell stock of Channel Wing as part of a public offering, but were not so prohibited if such sales were part of a private offering.

On April 14, 1965, the United States of America, acting at the instance of the United States Attorney for the District of Maryland and the Securities and Exchange Commission, filed an application to institute contempt proceedings against the defendants. On the basis of allegations showing reasonable cause to believe that the injunction may have been violated, an order to show cause was entered. Defendants responded, alleging that they had sold no securities in violation of the May 25, 1962 injunction, since all sales had been made for investment only, at private sale and under circumstances not involving any public offering. The matter was set down for hearing. Extensive testimony on behalf of plaintiff and on behalf of defendants has been heard and numerous exhibits on behalf of both parties were admitted. The case has been argued and submitted for decision.

Since May 25, 1962 to and including February 16, 1965, 1,579,590 shares of Class B common stock of Channel Wing have been issued and sold. Channel Wing realized a sum in excess of $400,000 as a result thereof. No registration statement was in effect during any portion of this period.

Of total sales, 225,567 shares, in the aggregate, were issued from time to time to "J. Ben Parent Associates," 397,581 shares, in the aggregate, were issued from time to time to "Bruce Wallace Associates," and 163,294 shares, in the aggregate, were issued from time to time to "Ward Brooks Associates." The

balance of the stock was issued and sold to various individuals.[1] The issuance of all of these shares was approved in writing by Custer, whose written authorization was directed to The Corporation Trust Company, transfer agent for Channel Wing; the stock was issued with the restrictive legend, "Resale or distribution of this stock is restricted. Details available at the office of the issuer," and with regard to most (but not all) of the stock, an investment letter was signed in substantially the form set forth in the margin [2] prior to issuance of the stock.

1.

| Date | Number of Shares | Name in which issued |
|------|------|------|
| 6/ 4/63 | 77,000 | Edward L. and Juanita L. Mortimer |
| 6/ 4/63 | 1,000 | Juanita L. Mortimer, custodian for Edward L. Mortimer, Jr. |
| 6/ 4/63 | 1,000 | Juanita L. Mortimer, custodian for Dona Anne Mortimer |
| 6/ 4/63 | 1,000 | Juanita L. Mortimer, custodian for Denny Lee Mortimer |
| 10/ 8/63 | 20,000 | John M. Hickey |
| 10/ 8/63 | 21,370 | Guy D. Clark and Lorraine L. Clark |
| 10/ 8/63 | 200,000 | Wayman Cornelson |
| 10/ 8/63 | 29,720 | Earl P. and Mary Grace Zepp |
| 10/ 8/63 | 45,000 | Roy Bishop and Phyrne Bishop |
| 3/10/64 | 42,000 | Harold Sabol and Irene Sabol |
| 6/ 2/64 | 10,000 | Harold Sabol and Irene Sabol |
| 6/18/64 | 60,000 | U. I. Smith |
| 6/25/64 | 20,000 | Wayman Cornelson |
| 7/ 7/64 | 20,000 | Charles A. Myers |
| 7/28/64 | 10,000 | Harold Sabol |
| 7/30/64 | 36,758 | Donovan Beachley |
| 8/ 6/64 | 38,000 | Leroy Bishop and Phyrne Bishop |
| 10/ 2/64 | 32,000 | Robert L. Chamberlin, Jr. |
| 10/29/64 | 4,000 | Robert L. Chamberlin, Jr. |
| 10/29/64 | 4,000 | Harold Sabol and Irene Sabol |
| 12/28/64 | 30,000 | Leo W. Morris |
| 1/11/65 | 30,000 | Charles L. Loomis |
| 1/27/65 | 30,000 | Donald L. Martins and Walter A. Bartel |
| 2/16/65 | 30,000 | Edward W. Kliewer |

2. "I have this day purchased from the Custer Channel Wing Corporation _____ shares of its Class B Common Stock at 25¢ per share, and paid $_____ in cash therefor. I understand that no registration statement is on file with the Securities and Exchange Commission with respect to this stock, and that the Corporation now has no stock with respect to which a registration statement is on file with said commission. This sale was initiated by my application to the Corporation and the Corporation agreed to sell me the stock only upon condition that I become informed to the extent I desire to do so about the Corporation in all and every aspect of its activities, including its litigation during the past few years, part of which I understand has resulted in an order of the Federal Court of Maryland, enjoining the Corporation from certain sales of stock. I am also aware that a Regulation 'A' Filing by the Corporation was suspended by the Securities and Exchange Commission in December, 1960.

"The Corporation has allowed me unlimited access to all its books, records, files, plant and personnel to obtain all information about its affairs which I desire. I have made such inquiry as I believe to be desirable for my purpose, and I have obtained all information I regard necessary for my decision to purchase the _____ shares of stock that I have this day purchased.

"In consideration of the sale of said stock to me, I hereby undertake and agree that I will not sell any of said stock within thirteen months from this date.

DATED: HAGERSTOWN, MARYLAND
_____, 196

_____ Associates"

Further explanation of sales to "J. Ben Parent Associates," "Bruce Wallace Associates," and "Ward Brooks Associates" is required. J. Ben Parent, Bruce Wallace and Ward Brooks are individuals interested in the financial success of Channel Wing, and the certification and marketing of the aircraft embodying the principles set forth in a patent issued to Custer. J. Ben Parent has never had any formal association with Channel Wing other than that of an investor who was interested in its financial welfare. The same may be said concerning Ward Brooks. Bruce Wallace initially occupied a similar position, but on March 9, 1964, some months after purchases of Channel Wing stock had been made in the name of Bruce Wallace Associates, he became a director of Channel Wing and thereafter participated actively as a director in the management of its affairs. J. Ben Parent Associates, Bruce Wallace Associates and Ward Brooks Associates, respectively, are not corporations, partnerships or associations; they are simply names, devised probably at the instance of a certain Cecil Custer (now deceased), who was a brother of Custer and one of counsel to Custer and Channel Wing.

These names were used as conduits for the sale of stock to other individuals, viz.: In the names of J. Ben Parent Associates, Bruce Wallace Associates and Ward Brooks Associates bank accounts were opened and maintained under the direction and control of the individual permitting the use of his name. J. Ben Parent, Bruce Wallace and Ward Brooks actively solicited their friends, neighbors and business acquaintances to purchase Channel Wing stock. Bruce Wallace was aided in his solicitation by Wayman Cornelson, who also later became a director of Channel Wing on March 9, 1964, and Samuel Stoner who had been a director since December 26, 1959. Persons desiring to purchase original issuance stock of Channel Wing would subscribe for their stock by indicating the number of shares they desire to purchase and making a check therefor payable to the "Associate" through whom they desired to purchase (usually at the price of 25¢ per share). The Associate would then undertake to subscribe to stock of Channel Wing, sign an investment letter therefor, obtain a group of certificates in the denominations for which individual subscriptions had been accepted, endorse the certificate (which bore the restriction on transfer above recited), in blank, and, except in the case of Ward Brooks Associates, deliver the certificates to the persons who subscribed for the stock. By these means J. Ben Parent Associates obtained 204 stock certificates and delivered them to the individual purchasers thereof; Bruce Wallace Associates obtained 253 stock certificates and delivered them to the purchasers thereof; and Ward Brooks Associates obtained 21 stock certificates but, although they were endorsed in blank, did not deliver them to the purchasers thereof. J. Ben Parent resides in Lake Park, Florida; Bruce Wallace resides in Enid, Oklahoma; and Ward Brooks resides in Garberville, California. The mails and instruments of interstate transportation and communication were freely used in effecting the issuance of stock to the individuals named in footnote 1, the "Associates" and persons subscribing through the "Associates" as described above.

Based upon the facts stated and further facts to be found in connection with various points considered in this opinion, plaintiff contends that Channel Wing and Custer have wilfully, in criminal contempt of this Court, disobeyed and defied the injunction of May 25, 1962. Plaintiff prays that they be adjudged in criminal contempt of this Court and punished in such manner as the Court may deem proper. The basic questions for determination are whether the sales of stock under the circumstances outlined are in violation of the injunction and, if so, whether defendants, or either of them, wilfully participated in or carried out activities in connection therewith such that they should be adjudged in criminal contempt of court.

## – I –

The first question to be considered is whether the injunction has been violated, i. e., whether the sale of stock to which reference has been made was a public offering for which § 5 of the Securities Act of 1933 required registration or whether it was a private offering exempt from a registration under § 4. The proof shows that except for a Regulation A filing, long since revoked, none of Channel Wing's stock has been registered with the Securities and Exchange Commission, either before or after entry of the May 25, 1962 injunction.

The legal answer to what is and what is not a private offering is found in Securities & Exchange Comm'n v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L. Ed. 1494 (1953). In that case the issuer made treasury stock available for purchase by certain of its key employees. Among those subscribing were employees with the duties of artist, bake shop foreman, chow loading foreman, clerical assistant, copywriter, electrician, stock clerk, mill office clerk, order credit trainee, production trainee, stenographer and veterinarian. The mails and other instrumentalities of interstate commerce were employed to effect the sales. The issuer argued that the transaction was a private offering, exempt from registration, because the offerees were limited to key employees.

■ After pointing out that the Securities Act nowhere defines the scope of the private offering exemption contained in § 4, and that the legislative history of the statute sheds little light on what was meant, the Court adopted as the test of what may be a private offering, " * * * the need of the offerees for the protections afforded by registration." Id. at 127, 73 S.Ct. at 985. The Court indicated that where it appears that an offering is limited to those persons who are able to fend for themselves, i. e. have access to the type of information that would be made available by a registration statement, the offering is exempt, as a private offering. But except for this limited circumstance, the offering is public and registration required. In arriving at this result, the Court specifically rejected as the sole test of what is a public offering the number of persons to whom stock was offered, the Court saying, " * * * nothing prevents the commission, in enforcing the statute, from using some kind of numerical test in deciding when to investigate particular exemption claims. But there is no warrant for superimposing a quantity limit on private offerings as a matter of statutory interpretation." Id. at 125, 73 S.Ct. at 985.

■ Under the test of Ralston Purina, the sales of Channel Wing's stock were manifestly a public offering. Among the transferees named in footnote 1, Wayman Cornelson is the only one who is shown by the evidence to have any connection with the corporation. Mr. Cornelson became a director on March 9, 1964 and, presumably, on and after that date he would have had access to the same kind of information concerning Channel Wing that would have been available in the form of a registration statement, but even as to Mr. Cornelson the majority of the stock which he purchased, namely, 200,000 shares, was bought four months prior to the time that he became a director. Among those named in footnote 1, Mr. U. I. Smith and Mr. Harold Sabol both testified in the proceedings. Although they signed investment letters acknowledging that they had unlimited access to all of the books, records, files, plant and personnel of Channel Wing to obtain all the information about its affairs which they desired, and that they had made inquiry and had obtained all information that they regarded necessary for their decision to purchase shares of stock, their testimony was clear that they were not furnished, nor did they have, anything more than the vaguest information about the financial affairs of Channel Wing.

■ It is not necessary, however, to rest the conclusion that shares of Channel Wing were distributed by public offering solely upon the sales to the persons named in footnote 1. The sales to

J. Ben Parent Associates, Bruce Wallace Associates and Ward Brooks Associates were also sales made as a part of a public offering, whether the sales be treated as limited to the three associates in whose name stock certificates were issued, or whether they be treated as sales to the individuals who advanced money to the various associates and who took from them (except from Ward Brooks Associates) certificates of stock endorsed in blank, albeit they bore a legend restricting transfer. This conclusion follows because if J. Ben Parent Associates, Bruce Wallace Associates and Ward Brooks Associates are treated as legal entities, the proof does not show that they had access to the same kind of information that the Act would make available in the form of a registration certificate. Mr. Parent never became a director of Channel Wing and had no connection with Channel Wing except as a stockholder. Ward Brooks never became a director of Channel Wing and had no connection with Channel Wing except as a stockholder. Bruce Wallace became a director on March 9, 1964, but substantial purchases of stock by Bruce Wallace Associates occurred on October 8, 1963.

■ Moreover, J. Ben Parent Associates, Bruce Wallace Associates and Ward Brooks Associates are not legal entities; they are only names. Hence, the conclusion is inescapable that the sales purportedly to them were actually sales to the individuals who subscribed in the name of one of the Associates, and who furnished the consideration for the shares purportedly issued in the name of the Associate. Many of these individuals testified at the contempt hearing, and it appears that they had no connection with Channel Wing such as would give them access to information of the type which the Act would make available in the form of a registration statement, and they were neither asked to sign, nor did they sign, any investment letter.[3] The mere fact that the certificates of stock which they held were issued in the name of the Associate through whom they had purchased it with a restrictive legend on transfer does not render them any the less the equitable owner thereof where they furnished the consideration for the issuance of that certificate. Channel Wing and its transfer agent seemed to be of this view, because the Assistant Vice President of The Corporation Trust Company testified that after May, 1962 transfer of restricted stock was permitted in one instance because it was a hardship case, i. e., someone badly needed money.

■■ Defendants stress the comparatively limited number of persons to whom stock was issued after entry of the injunction as a factor having significance to establish that the offering after May 25, 1962 was a private one. Of course, defendants treat the three Associates as single entities in advancing this argument, but the Court has found that the Associates were mere conduits for a much larger number of individuals. Furthermore, the number of offerees is significant only as it bears upon whether the character of the group of offerees is private, i. e., whether the group has " * * * the requisite association with and knowledge of the issuer which make the exemption available." SEC Securities Act Release No. 4552 (1962). It is only one of many elements to be considered in making the factual determination that a public offering does or does not exist. SEC Securities Act Release No. 285 (1935); Loss, Securities Regulation 653–96 (2d ed. 1961). e. g., D. F. Berheimer & Co., SEC Securities Exchange Act Release No. 7000 (1963) (sale of $175,000 of convertible debentures to 18 of 22 offerees, most of whom were stock-

---

3. A representative group of purchasers through the "Associates" testified. Their testimony, without exception, was that they were not asked to sign, nor did they sign, an investment letter. They demonstrated a lack of knowledge of the financial affairs of Channel Wing, as well as the absence of a tender by defendants, or the "Associates," of such data. To restrict cumulative evidence, the Court limited the number of such witnesses it would hear at the behest of the plaintiff. Defendants offered no contrary proof.

holders of the issuer, not shown to be entitled to an exemption as a private offering).

■ The argument that the number of offerees, whether great or small, is determinative on the issue of public or private offering was specifically rejected in the Ralston Purina case. Indeed, in that case the dictum of an English judge to the effect that a single person may be the public if he is intended to be the first of a series of subscribers, but makes further proceedings needless by himself subscribing the whole, is quoted with approval. The test adopted to determine what is public and what is private is whether the offeree is able to fend for himself and, if not able to fend for himself so that the offering becomes public, it makes no difference whether the offerees are few or many.

■ Defendants also lay great stress on the investment letter, the form of which is set forth in footnote 2. Even if the form of investment letter was signed by each of the persons named in footnote 1, the investment letter is simply evidence of what information was given them and what information they obtained. Two of them, Messrs. Smith and Sabol, were offered little and obtained less. Again, the form of investment letter was signed in the name of the three Associates, but the real purchasing public on whose behalf the Associates acted were not aware of, nor were they asked to sign, any investment letter. Even if each offeree were voluntarily furnished the information about the issuer which would have been required for registration, the offering might not then be exempt as private because such a statutory " * * * construction would give each issuer the choice of registering or making its own voluntary disclosures without regard to the standards and sanctions of the Act," and would make the Act's effective enforcement nearly an administrative impossibility. SEC Securities Act Release No. 4552, supra.

■ In order for an offering to fall within the exemption of § 4 two conditions must be met. First, the offeree must have such information as registration would have disclosed or have access to such information and, secondly, the purchasers must take for investment. Loss, Securities Regulation, supra, at 665–72. See Merger Mines Corp. v. Grismer, 137 F.2d 335 (9 Cir. 1943), cert. denied 320 U.S. 794, 64 S.Ct. 261, 88 L. Ed. 478 (1943); S. E. C. v. Mono-Kearsarge, 167 F.Supp. 248 (D.C.Utah 1958). The use of an investment letter, as well as other devices, to insure that securities are purchased for investment is discussed in Non-Public Offering Exemption, SEC Securities Act Release No. 4552, supra. There it is pointed out that an important factor to be considered is whether the securities offered remain in the hands of the initial informed group or whether the initial purchasers are merely conduits for a wider distribution. The distinction is important to the seller because if the initial purchasers acquire securities with a view to public distribution the seller assumes the risk of possible violation of § 5 and consequent civil liabilities. The release then states:

"This has led to the practice whereby the issuer secures from the initial purchasers representations that they have acquired the securities for investment. Sometimes a legend to this effect is placed on the stock certificates and stop-transfer instructions issued to the transfer agent. However, a statement by the initial purchaser, at the time of his acquisition, that the securities are taken for investment and not for distribution is necessarily self-serving and not conclusive as to his actual intent. Mere acceptance at face value of such assurances will not provide a basis for reliance on the exemption when inquiry would suggest to a reasonable person that these assurances are formal rather than real. The additional precautions of placing a legend on the security and issuing stop-transfer orders have proved in many cases to be an effective means of preventing illegal distributions. Nevertheless, these are

only precautions and are not to be regarded as a basis for exemption from registration. The nature of the purchaser's past investment and trading practices or the character and scope of his business may be inconsistent with the purchase of large blocks of securities for investment. In particular, purchases by persons engaged in the business of buying and selling securities require careful scrutiny for the purpose of determining whether such person may be acting as an underwriter for the issuer."

 It thus appears that a signed investment letter is some evidence that a security is purchased for purpose of investment. Even conclusive evidence of a purchase for purpose of investment, standing alone, however, is not sufficient to render an offering a private one unless the first condition for a private offering has been met, namely, that the purchasers have, or have access to, the type of information that would be disclosed in a registration statement. The record here is conclusive that the persons named in footnote 1, the "Associates" as such, and the persons purchasing through the Associates did not have such information or access to such information. Hence, even if the investment letter with the restriction on stock transfer is treated as conclusive proof of a purchase for the purpose of investment, the legal conclusion is inescapable that the transactions involving stock of Channel Wing since the

date of the injunction have been a public offering in violation of the injunction.

– II –

 The next aspect of the case to be considered is whether defendants, or either of them, wilfully participated in or carried out activities in connection with the public offering such that they should be adjudged in criminal contempt of court. While counsel for all parties agree that wilfulness is an element of the criminal contempt charged here, they disagree sharply as to what is meant. The plaintiff argues that wilfulness is established if it is shown that the defendants had full knowledge of all of the essential elements of the public offering. The defendants argue that, additionally, there must be proof of evil purpose or bad motive on their part; in other words, proof of specific intent to violate the injunction. For reasons which will presently appear, the Court concludes that proof of specific intent is not required; it is enough if the evidence demonstrates beyond a reasonable doubt that defendants, or either of them, when performing some overt act, had knowledge of all the facts collectively constituting criminal contempt.

There is little case law having direct bearing on the issue. In essence, the claim that defendants violated the injunction is a claim that defendants violated § 5 of the Act, 5 U.S.C.A. § 77e(a),[4] for which they could be prosecuted under § 24 of the Act, 15 U.S.C.A. § 77x.[5] First

---

4. "§ 77e. Prohibitions relating to interstate commerce and the mails
 (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
 (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
 (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

5. "77x. Penalties
 Any person who willfully violates any of the provisions of this subchapter, or the rules and regulations promulgated by the Commission under authority thereof, or any person who willfully, in a registration statement filed under this subchapter, makes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both."

to be considered will be the standard of conduct which must be shown to have been violated before the penal sanctions of the Act may be applied.

Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), although arising on facts quite dissimilar to those of the case at bar, is the modern bible of the circumstances in which proof of criminal or specific intent is an essential element in a successful prosecution. To generalize, the thesis of the case is that the necessity of proof of specific intent is " * * * as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." Id. at 250, 72 S.Ct. at 243. However, a more recent development of the criminal law is " * * * to call into existence new duties and crimes which disregard any ingredient of intent." Id. at 253, 72 S.Ct. at 245. Examples of the latter and the needs of society which require recognition of nonintentional criminal conduct are described as follows:

"The industrial revolution multiplied the number of workmen exposed to injury from increasingly powerful and complex mechanisms, driven by freshly discovered sources of energy, requiring higher precautions by employers. Traffic of velocities, volumes and varieties unheard of came to subject the wayfarer to intolerable casualty risks if owners and drivers were not to observe new cares and uniformities of conduct. Congestion of cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times. Wide distribution of goods became an instrument of wide distribution of harm when those who dispersed food, drink, drugs, *and even securities,* did not comply with reasonable standards of quality, integrity, disclosure and care. Such dangers have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, properties or activities that affect public health, safety or welfare." Id. at 253–254, 72 S.Ct. at 245 (emphasis supplied)

As to the latter statutes imposing criminal sanctions for "public welfare offenses," the Court added:

" * * * whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime." Id. at 256, 72 S.Ct. at 246.

The Court nevertheless recognized that even in the area of "public welfare offenses" Congress may see fit to make intent a decisive element of criminal conduct. In this connection, it is significant that the Court, in footnote 23 on page 264 of its opinion, 72 S.Ct. 240, referred to at least three statutes in which use of the word "willfully" was considered to have this effect. Section 24 of the Securities Act of 1933, 15 U.S.C.A. § 77x, under which a prosecution of the defendants for their alleged wrongful conduct in the case at bar would proceed, employs the word "willfully." [6]

6. See text note 5, supra.

Aside from the use of the word "willfully" in § 24 of the Act, there is ample support in the cases for treating the Securities Act of 1933 as legislation having broad remedial purposes and thus in its criminal sanctions to create a class of "public welfare offenses." Securities & Exchange Comm'n v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943).[7] See also, Securities & Exchange Comm'n v. Ralston Purina Co., supra; Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953); Berko v. Securities & Exchange Comm'n, 316 F.2d 137 (2 Cir. 1963); Creswell-Keith, Inc. v. Willingham, 264 F.2d 76 (8 Cir. 1959); Otis & Co. v. Securities & Exchange Comm'n, 106 F.2d 579 (6 Cir. 1939). There is also support in the congressional history of the Securities Act for the conclusion that Congress intended the Act to be remedial and intended to protect an unsuspecting public from the irresponsibility which had been demonstrated in the distribution of securities prior to the Act's passage in 1933. H.R.Rep.No.85, 73d Cong., 1st Sess. 1–5 (1933); S.Rep.No. 47, 73d Cong., 1st Sess. 1–2 (1933).

United States v. Sussman, 37 F. Supp. 294 (E.D.Pa.1941), is apparently the only case which has passed specifically on the issue of what proof of intent is needed to sustain a criminal prosecution for violation of § 5 of the Act. In that case, in ruling on a motion for a new trial, the trial judge remarked, "I did not then and do not now conceive an element of the crime * * * to be actual knowledge that a security was being sold in violation of the law." Id. at 296. It should be noted that there was no discussion of the statement, no citation of authority was referred to in support of it and, moreover, the statement was made in a criminal prosecution under the Act as possibly distinguishable from a proceeding for a determination of criminal contempt of court.

A decision of the Eighth Circuit, Kistner v. United States, 332 F.2d 978 (8 Cir. 1964), lends support to the conclusion that a successful prosecution for failure to comply with § 5 of the Act does not require proof of specific intent. In this case, which arose as a motion filed under 28 U.S.C.A. § 2255, a defendant who had been convicted first of violating § 5 of the Act, 15 U.S.C.A. § 77e (a) (2), and later of violating § 17, 15 U.S.C.A. § 77q(a) (fraudulent interstate transactions) as a result of his activities in the same transaction, claimed that he had been subjected to double jeopardy. Assuming for the purpose of the decision that the question of double jeopardy could be reached on such a motion, the Court concluded that defendant was not twice placed in jeopardy. The Court stated that it was bound to apply the "same evidence" test and, in application of that test, made the following statement:

"As spelled out in United States v. Attaway, 211 F.Supp. 682, 684 (W. D.La.1962), the essential facts constituting a crime under § 77e(a) (2) are that '(1) a "security" was carried through the mails or in interstate commerce, (2) for the purpose of a sale or delivery after a sale, and (3) that *no registration statement was in effect as to such security at the time thereof * * *.'* (Emphasis supplied.) Whereas, the *sine qua non* of the crime under § 77q(a) is not the interstate transportation of an *unregistered* security, but the perpetration of a fraudulent scheme upon a duped investor, federal jurisdiction of which is acquired from the incidental utilization of the channels of interstate commerce to transport the misrepresented securities. United States v. Cashin, 281 F.2d 669 (2nd Cir. 1960); United States v. Attaway, supra; United States v. Green-

***

7. Since Mr. Justice Jackson was the author of the opinion of the Court in this case, it would appear that he had this case in mind when, subsequently writing

for the Court in Morissette v. United States, supra, he employed the italicized phrase "and even securities" cited in the text.

berg, 30 F.R.D. 164 (S.D.N.Y.1962). Therefore, under the first indictment, the Government must prove only that the defendant caused to be carried in the mails a security unregistered with the Securities and Exchange Commission to sustain a conviction within the meaning of § 77e(a) (2); while proof of a violation of § 77q(a), as charged in the second indictment, demands the quite different evidence that the defendant with intent committed a fraud upon the purchaser of a security by means of an untrue or omitted statement of a material fact or engaged in a course of business designed to deceive the purchaser." 332 F.2d at 980–981.

The significance of this statement is that intent was not mentioned as an element of the crime under § 77e(a) (2), but was an essential element of the crime under § 77q(a).

These cases, however, should be compared with three appellate decisions of the Second Circuit, which touch upon the concept of wilfulness in prosecutions under the Securities Act of 1933. The first, United States v. Crosby, 294 F.2d 928 (2 Cir. 1961), arose under complicated and perhaps unique facts. A brokerage firm and its three stockholders were convicted of violating § 5 of the Act, but on appeal their convictions were reversed. Proof showed that the issuer of the securities had given 2,000,000 shares for prospecting permits. Many of these shares were returned to the brokerage firm and sold through it. The defendants knew that the stock was not registered, but they had opinion letters from counsel that registration was not required. By construction of § 4(1) of the Act, the Court concluded that the close question of whether registration was required should be decided adversely to the defendants, but the Court also concluded that, because of lack of clarity in the regulatory scheme, the defendants did not know, nor should they have known, that registration was required. While this conclusion was contrary to the opinion of counsel under which the

defendants acted, the Court concluded that counsel's opinion was not so patently erroneous as to permit the jury to speculate on the defendants' good faith.

In the course of its opinion on the aspect of the case with which we are concerned (294 F.2d at 938–943), the Court employed a number of phrases from which it could be argued that its concept of wilfulness required proof beyond a reasonable doubt of evil purpose on the part of the defendants, i. e., a specific intent to violate the Act, but a careful reading of the opinion leads this Court to the conclusion that the case is not direct authority for that rule. In the first place, in the portion of the opinion relevant here, the Court was discussing simultaneously a conspiracy count, as well as several substantive counts on which the defendants were indicted, so that reference to guilty knowledge and criminal intent may relate only to the conspiracy count, in which guilty knowledge is an element of the crime.

More importantly, an analysis of the Court's opinion indicates that its holding was that the government had failed to prove beyond a reasonable doubt knowledge on the part of the defendants of a fact essential to constitute the commission of the substantive offense on their part. In the case the brokers were claiming an exemption from § 5 on the theory that under § 4 they were not underwriters. On an aspect of this contention, the Court found:

"It is key here that the government nowhere showed that the brokers [defendants] knew the details of the alleged transfer from Gully to Castagna—or that they knew the latter's relation to and probable domination by McCarthy. Thus there was no evidence that the brokers knew or should have known that they were 'underwriters' in terms of the Securities Act." 294 F.2d at 942.

It was in the context of this finding, then, that the Court, earlier in its opinion, expressed its holding:

"The proof is clear that no Texas-Adams stock was ever registered—

and that defendants knew that the particular certificates involved in Counts 46–8 were not registered. There were, however, opinion letters claiming the shares to be exempt from registration. Two basic elements thus remain: Were the shares exempt? If not, does the record adequately prove the necessary knowledge on the part of these defendants to support the element of wilfulness? We hold that, while the shares should have been registered, there was insufficient proof from which the jury legitimately could have inferred wilfulness and criminal intent." Id. at 938–939.

It is not clear from the Crosby opinion whether the Court would require specific intent to violate the statute and was holding that such specific intent is impossible without knowledge of the factors which constitute the violation, or whether it would conclude that only intent to do the act knowing of the factors which constitute the violation, was required. This Court thus understands United States v. Crosby, supra, not to decide the threshold question considered in this case, although it did decide at least that knowledge of the factors constituting the violation was required before a wilful violation can be found.

United States v. Robertson, 298 F.2d 739 (2 Cir. 1962), sheds no greater light on the problem. In that case a conviction on two counts of using the mails or instruments of transportation or communication in interstate commerce to sell unregistered certificates was also reversed. The Court, citing United States v. Crosby, supra, stated that the parties did not appear seriously to contest the claimed insufficiency of the charge to the jury on these counts as to wilfulness judged by the test established in the Crosby case, but the opinion fails to disclose what was the charge and, hence, it cannot be determined by this Court that the question facing it was there decided.

United States v. Crosby, supra, has also been cited in United States v. Dardi, 330 F.2d 316 (2 Cir. 1964). Again, broker-dealers were convicted of unlawful sales of unregistered stock. They did not dispute that they sold the stock, or that it was not registered, but they claimed they were ignorant that registration was required. The key to this question was found by the Court to rest in the crucial issue as to whether the broker-dealers knew that they were selling for a "control" group. Overall, the Court concluded that there was sufficient evidence from which the jury could conclude beyond a reasonable doubt that the broker-dealers knew that they were acting for a control group and, hence, the judgments entered on their convictions were affirmed. In arriving at this result, the Court stated, "[i]n United States v. Crosby, supra, this Court found that there was insufficient evidence that the broker-dealers 'knew or should have known that they were "underwriters" in the terms of the Securities Act.' The evidentiary problem here is whether the link missing in Crosby has been supplied." Id. at 325–326. An analysis of the evidence led the Court to conclude that each of the three broker-dealers could probably have been found by the jury to know that the sellers were "control" persons, so that the broker-dealers were "underwriters" and registration was required.

United States v. Dardi, supra, thus reinforces this Court's initial reaction that Crosby was decided on the basis of insufficient proof of knowledge. More importantly, Dardi takes a next step and seems to indicate that specific intent need not be proved beyond a reasonable doubt to sustain a successful prosecution. This conclusion that United States v. Dardi has this effect stems from the Court's limiting its consideration to the question of knowledge on the part of the broker-dealers of the fact that registration was required and not considering or discussing the need for

proof of specific intent.[8] Consequently, it appears to this Court that what Dardi requires, and all that Dardi requires, to constitute a wilful violation of § 5 of the Securities Act is intentional activity in violation of § 5 with knowledge of all the factors constituting the violation, but not proof of evil purpose. The Court adopts this rule as the proper one in a prosecution for violation of § 5 of the Act.

This conclusion is in harmony with the cases previously cited and discussed. Under this conclusion, actual knowledge that the sale is in violation of the law, the standard rejected in United States v. Sussman, supra, is not required. All that is required is knowledge of all the facts which constitute the violation. This conclusion does no violence to Kistner v. United States, supra, because that case did not even reach the question of whether knowledge of facts which would make a registration statement required was a prerequisite to establishing a criminal violation of § 5. As previously noted, United States v. Crosby, supra, and United States v. Robertson, supra, do not foreclose the question at issue in this case.

The conclusion reached promotes the remedial purposes of § 5 of the Act. It should be noted that, under § 12 of the Act, 15 U.S.C.A. § 77l civil penalties may attach to a person who violates § 5, regardless of his intent or knowledge. Such a statutory scheme is in keeping with the remedial purpose of the Act, which is broadly designed to protect the public. A requirement of something less than specific intent or evil purpose to show a criminal violation of the Act is also in harmony with the Act's remedial purpose. At the same time, the conclusion gives meaning to the language in § 24, which requires a wilful violation before penal sanctions may be imposed. A requirement of intent on the part of the accused deliberately to do an act constituting part of the intent with knowledge of all of the other factors constituting the violation distinguishes § 24 from some of the public welfare offenses discussed in Morissette v. United States, supra, where the mere act may constitute a crime, regardless of intent, if it is prohibited by statute and Congress has not included any language such as "wilful" in the penal provisions. e. g. 21 U.S.C.A. § 333(a) (Food, Drug & Cosmetic Act).

– III –

The authorities discussed to this point are all cases in which there was a direct prosecution for violation of the Act. The case at bar, however, is a prosecution for a violation of the injunction, and so there must be considered the correlation, if any, between the need for proof of specific intent, if any, to show a substantive violation of the Act to the need for proof of specific intent, if any, to show a criminal contempt in violation of an injunction. Here again, as with the need to prove specific intent to prosecute successfully under the Act, the decided cases are not conclusive.

In the unreported case of United States v. Wilson-Williams, Inc., No. 149–6 (S.D.N.Y.1961), it was said, by way of dictum, that proof of specific intent was not an essential element of the proof upon a charge of criminal contempt for the violation of an injunction against misbranding under the Food, Drug & Cosmetic Act because that Act does not require such proof in a direct prosecution, and it would be an anomaly to require proof of specific intent in the contempt situation when no such requirement was necessary to prove a criminal violation.

United States v. Schlicksup Drug Co., 206 F.Supp. 801 (S.D.Ill.1962), achieved a similar result but on slightly different

---

8. Dardi could be read as saying that the issue of whether the brokers knew they were selling for a "control" group was crucial because once that fact was established, the brokers, who were in the business of handling securities, would have actually known, or would have been bound to know, that they were acting in violation of the statute and *thus specific intent to violate the Act would be implied.* This is an unlikely reading, however, because in affirming the convictions the Second Circuit did not say that it was implying intent.

reasoning. There again, the issue was whether defendant was guilty of criminal contempt in violating an injunction against adulteration of articles of drugs proscribed by the Act. The Court found that defendant had specific intent to violate the injunction, but nevertheless discussed in some detail the necessity of proof of that element. The Court pointed out that in United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), it had been held that proof of specific intent under that Act was unnecessary to sustain a prosecution, and that, also under that Act, injunctive relief was available for the purpose of enforcement, as well as criminal sanctions. If injunctive relief were sought, proof of specific intent was not required. The Court stressed the substantial interrelationship between the criminal remedial provisions of the Act and a contempt proceeding arising from the violation of a remedial order based upon the Act. Thus, Chief Judge Mercer concluded, at 206 F.Supp. 805:

> "It would be anomalous, indeed, therefore, to require proof of specific intent in continued violations of the Act, and in violation of an injunction, before the court which issued the injunction could enforce it by a contempt proceeding. Such a result would not only defeat the purposes of the Act, but it might also sterilize the court's power to compel obedience to its orders."

Possibly United States ex rel. Porter v. Kroger Grocery & Baking Co., 163 F.2d 168 (7 Cir. 1947), is a contrary authority. That case was a criminal contempt proceeding for violation of an injunction issued under the Emergency Price Control Act. In clear and unmistakable language, specific intent was an essential element of criminal sanctions imposed by the Act, and the government's petition for a citation for contempt charged knowing, flagrant and wilful disobedience of the injunction. Proof of specific intent was held to be an essential element to sustain a conviction of criminal contempt. The case does

recognize, however, as was pointed out in United States v. Ford, 9 F.2d 990 (D. Mont.1925), and Morissette v. United States, supra, that even when specific intent is required, specific intent may be inferred from forgetfulness, neglect or failure of or indifference to duty or consequences.

 The power to punish for violation of an injunction enjoining transgression of § 5 of the Act should not be less than the power to enforce § 5 of the Act by criminal sanctions. Both have the same ultimate objective—protection of the investing public—so that a greater quantum of proof or additional elements of proof should not be required in the former proceeding as contrasted to the latter. The facts that if criminal contempt is found the Court has a relatively unlimited power to punish (18 U.S.C.A. § 401), or that defendants may not be entitled to a jury trial where as here the original injunction was obtained by the United States (18 U.S.C.A. § 3691), do not require a different conclusion. These considerations are outweighed by other factors. An injunction like the original injunction here is granted only because there is a showing, *inter alia*, of more than a remote possibility of future harm. The person enjoined is put on notice that his past acts have violated the law, and that there is a substantial likelihood of future violation. No concept of basic fairness is violated by requiring a person in this position to be more than normally careful in his future conduct. Moreover, the Court's power to do justice by granting injunctive relief would be seriously embarrassed, if not destroyed, by a requirement of greater proof to show a violation of the injunction than to show a violation of the statute incorporated into its order.

 Indeed, reason would support the application of a rule which permits a lesser showing to prove criminal contempt than to show a criminal violation of the Act in the first instance. Like the Pure Food, Drug & Cosmetic Act, the Securities Act of 1933 authorizes

entry of the injunction which defendants are charged with violating, without regard to the factor of intent.[9] Such an order, when entered, must be respected. When, as here, the acts constituting an infringement of the injunction, if considered alone, would support the entry of an injunction, the necessity of creating respect for its own order may well lead to the conclusion that a court should not require as much proof to show criminal contempt as to show a basis for original injunctive relief. Ordinarily, the creation of a remedy to redress private wrongs resulting from a violation of an injunction is the object of a proceeding for civil contempt. Under the facts here neither defendant is in a financial position to restore the purchasers of 1,579,590 shares of stock to their former status. Remedial action, if any, can be obtained solely from the deterrent effect of criminal sanctions. This is a second factor which would point to the correctness of not requiring as much proof to show criminal contempt as is required to show a substantive violation.

In any event, the Court does not deem it necessary to decide whether criminal contempt may be shown by proof which fails to show a criminal violation of § 5 of the Act, because an analysis of the proof which will follow leads the Court to conclude that defendants actually or vicariously had knowledge of each of the acts constituting a contempt and participated in them wilfully in the sense that they did so intentionally and not inadvertently or accidentally. Thus, the Court concludes that the proof would be sufficient to sustain a prosecution for violation of § 5 of the Act, irrespective of whether an injunction against such violation had been previously entered.

## – IV –

In support of this conclusion, the Court now turns to the proof to show the extent of defendants' knowledge and participation in the public sale of 1,579,590 shares of Channel Wing's Class B common stock.

Defendants in their response to the petition to an order adjudging them in criminal contempt admit knowledge of entry of the May 25, 1962 injunction and that thereafter Channel Wing's common stock was not registered with the Securities and Exchange Commission. The extent of defendants' other knowledge must be considered in three separate steps. Defendants pitch their whole defense on lack of knowledge that sales to the "Associates" were in fact sales to persons who subscribed to Channel Wing stock through an Associate. But the extent of defendants' alleged contempt is not so limited by the facts. The Court has already concluded that there was a public offering of Channel Wing's stock subsequent to the injunction in at least three separate respects, viz., (1) sales to the persons named in footnote 1, (2) sales to the "Associates," and (3) sales to persons for whom the "Associates" were conduits. Defendants' knowledge and participation in each of these groups of transactions must be separately considered.

Defendant Custer, as President of Channel Wing, authorized and directed The Corporation Trust Company to issue the shares of stock sold to the persons named in footnote 1. Thus he, individually and acting on behalf of Channel Wing, was bound to know that the shares had been sold and were being issued.

9. "§ 77t. Injunctions and prosecution of offenses

\* \* \* \* \*

(b) Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, it may in its discretion, bring an action in any district court of the United States or United States court of any Territory, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond."

Indeed, in connection with direction and authorization to issue the shares, he certified the consideration therefor, a fact significant to the transfer agent since it was thus able to determine what stock transfer taxes were payable. Subsequently, in each instance, the certificates issued by The Corporation Trust Company were sent to defendant Custer in his capacity as President of Channel Wing. It may be inferred that delivery was then made to the alternate purchasers. Defendant Custer and Channel Wing knew, or had knowledge of facts from which they are presumed to have known, at the time of each transaction that the person to whom the shares were issued and sold was not a person who had actual intimate knowledge of the affairs of Channel Wing or a person who had access to the information that a registration statement would disclose. These persons were manifestly not so closely associated with Channel Wing that they either had intimate knowledge of the corporation's affairs or could command access to information which could give them such knowledge. As a matter of fact, they were not even furnished such information voluntarily.

The same is true with respect to sales to the Associates, except that Bruce Wallace became a director on March 9, 1964, and thereafter may be presumed to have had access to the requisite knowledge of the corporation. As has been previously mentioned, however, substantial sales to Bruce Wallace Associates were made on or about October 8, 1963.

There remains to be considered the extent to which, if at all, both defendants had knowledge that the Associates were in fact conduits for a substantial number of undisclosed purchasers who subscribed through the Associates. Defend-

ant Custer in his testimony denied flatly that he knew that standing behind the Associates were a large number of people from whom originated the cash consideration for the sales of stock to the Associates. In this respect his testimony was corroborated by the testimony of Wayman Cornelson, who assisted in the solicitation of subscriptions for Bruce Wallace Associates and Bruce E. Wallace. Ward Brooks and J. Ben Parent offered some corroboration also. But the record shows that each of the four named witnesses had testified under oath in an administrative proceeding before a Securities and Exchange Commission examiner to the effect that there had been free and frank discussion between them and defendant Custer about the operation of the "Associate" with which each was connected. Each conveniently forgot, or unconvincingly explained away, such testimony when he appeared before this Court. Messrs. Brooks and Parent were less successful in exhibiting convenient memories, and more disposed to be truthful witnesses than Messrs. Cornelson and Wallace, because Mr. Brooks did acknowledge some of his testimony in the administrative proceedings to be true, and Mr. Parent did admit—although he thereafter subsequently denied—that he had discussed the workings of J. Ben Parent Associates with defendant Custer.

In making this observation about the credibility of these four witnesses, the Court is aware that the portions of their testimony before the S.E.C. examiner which it permitted to be read to them at the instance of the government in an attempt to refresh their recollection are not to be treated as affirmative evidence.[10] To the extent that the

---

10. The government did not attempt either to authenticate and offer the transcripts of administrative proceedings, or to press upon the Court the evidentiary rule adopted in the Second Circuit. See United States v. DeSisto, 329 F.2d 929 (2 Cir. 1964); United States ex rel. Ng Kee Wong v. Corsi, 65 F.2d 564 (2 Cir. 1933), overruled in Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945);

DiCarlo v. United States, 6 F.2d 364 (2 Cir. 1925); McCormick, Evidence § 39 (1954); 3 Wigmore, Evidence § 1018 (3d ed. 1940). Contra, United States v. Rainwater, 283 F.2d 386 (8 Cir. 1960); Ellis v. United States, 138 F.2d 612 (8 Cir. 1943); McCracken v. Richmond, Fredericksburg and Potomac R. Co., 240 F.2d 484 (4 Cir. 1957); Sykes v. O'Hearne, 181 F.Supp. 368 (D.Md.1960).

readings of the prior transcripts adversely affect the credibility of these witnesses, the fact remains that the witnesses were called as government's witnesses to assist the government in meeting its burden of proof beyond a reasonable doubt, and impeachment has the effect only of discrediting them but does not convert their testimony into affirmative proof. However, as alibi witnesses for defendants, they are totally unworthy of belief.

 Notwithstanding Mr. Custer's denials, and notwithstanding the denials of his four close Associates, other evidence establishes beyond a reasonable doubt that defendant Custer, and through him Channel Wing, knew that purported sales to the Associates were in fact sales to an undisclosed number of individuals having no connection with Channel Wing, other than as investors. A large part of this evidence is documentary; some consists of testimony.

By way of general background, it should be stated that Channel Wing was attempting to manufacture an aeroplane embodying certain concepts of aerodynamics developed by defendant Custer and for which a patent had been issued. The accomplishment of the objective required substantial amounts of cash and substantial investment, and, to state the matter succinctly, Channel Wing was in desperate financial straits, particularly after the injunction entered May 25, 1962. Channel Wing's need for cash to complete engineering studies and to obtain a certification of its aircraft by federal aviation authorities was the subject of continuous discussion after May 25, 1962. In August, 1962, defendant Custer discussed the money needs of Channel Wing with J. Ben Parent. Tentative agreement to sell 100,000 shares in the aggregate of Channel Wing stock to residents of Palm Beach, Florida was made. The shares were to be sold in blocks of 20,000 at a consideration of $5,000.00 per block. This plan, however, was not successful because purchasers for stock in this quantity were not to be found.

Thereafter, the device of J. Ben Parent Associates was hit upon. Probably the concept originated with Cecil Custer (now deceased), a brother of defendant Custer, and one of counsel for Channel Wing. Once the device had been conceived and put into operation, the proof shows that defendant Custer knew precisely what was going on.

First and foremost, among the evidence indicating knowledge on the part of defendant Custer, and through him on the part of Channel Wing, is the great bulk of correspondence indicating the mechanics by which the stock was issued. In regard to all sales of stock, including sales to J. Ben Parent Associates, defendant Custer, as President of Channel Wing, having an office in Hagerstown, Maryland, would write to The Corporation Trust Company, in Jersey City, New Jersey, authorizing and directing the latter to issue shares as indicated in the letter. In each instance of a sale to J. Ben Parent Associates, or either of the other two Associates when they were established, defendant Custer would designate the number of certificates and denominations thereof to be prepared. Defendant Custer would also certify the sales price for the stock. Typical of such transactions is the first such letter, dated October 16, 1962, in which defendant Custer directs the issuance of 34,000 shares to J. Ben Parent Associates, and specifies "8 certificates of 4,000 each—one certificate of 2,000 shares." Additionally, by letter of January 21, 1963 defendant Custer directed the issuance of 16,000 shares to J. Ben Parent Associates, consisting of "16 certificates of 1,000 shares each;" by letter dated September 27, 1963 defendant Custer directed the issuance, *inter alia*, of 84,900 shares to J. Ben Parent Associates, consisting of "34 certificates of 2,000 each—16 certificates of 1,000 each —9 certificates of 100 each," 38,000 shares to Ward Brooks Associates, consisting of "4 certificates of 1,000 each— one certificate of 4,000 each, 3 certificates of 10,000 each," and 123,600 shares to Bruce Wallace Associates, consisting

of 2 certificates of 20,000 shares, one certificate of 8,000 shares, 6 certificates of 5,000 shares, one certificate of 4,100 shares, 4 certificates of 4,000 shares, one certificate of 3,000 shares, 3 certificates of 2,000 shares, 2 certificates of 1,500 shares, one certificate of 1,200 shares, 9 certificates of 1,000 shares, one certificate of 600 shares, one certificate of 500 shares, four certificates of 400 shares, two certificates of 200 shares, and 2 certificates of 100 shares. Twenty-two letters of similar vein were written, the details of which will not be recited.

This proof, standing alone, would seem inescapably to indicate that defendant Custer knew that the "Associates" were not ultimate purchasers of Channel Wing stock, but were conduits for distribution to others. But the record shows even more specific proof in this regard, namely, the letters to defendant Custer and Channel Wing concerning the issuance of stock.

In connection with his operation of J. Ben Parent Associates, which was the first of the "Associates" to begin the distribution of stock, Mr. Parent wrote defendant Custer under date of October 18, 1963, sending a check for the issuance of 1,000 shares of stock. He stated that he had had nine certificates in denominations of 100 shares "but it was not enough," and he requested defendant Custer to send ten 100 share certificates. Significantly he added, "I had several more that wanted stock, but they can buy it through the brokers at a lower price." Three days before, Mr. Parent had transmitted a check and ordered 8,000 shares of stock. After directing that it be made out the same way as "the other Stock that I have purchased," he added "there may be additional purchases, if there is still some of this Stock for sale." In a similar letter under date of June 26, 1963, Mr. Parent made the comment, "I expect several more Checks to come in very soon. I will forward them as they come in." In another similar letter dated September 24, 1963, in which Mr. Parent directed that 12,800 shares of stock for which the consideration was enclosed be issued in 16 certificates of varying denominations, Mr. Parent commented, "I am expecting more Checks before the middle of next week." On August 25, 1964, when Mr. Parent transmitted a check for 3,667 shares of stock, he stated that it was his understanding that that amount "cleans up the total Balance" of all of the stock "that I have been selling to my self as well as my good friends."

When Bruce Wallace Associates was devised as a means for selling stock, Mr. Wallace initially did not understand how Bruce Wallace Associates should operate. By letter dated June 22, 1963 Mr. Wallace transmitted checks totaling $63,-550.00 for the purchase of 154,000 shares of stock. From the tenor of the letter, the Court finds that the checks transmitted were those given him by the ultimate purchasers and were not checks of Bruce Wallace Associates. Mr. Wallace in his letter specified that the stock certificates were to be issued as follows, and he then named nineteen individuals, including himself, as the persons in whose names certificates should be issued, and stated the denomination of the certificate for each. He also stated in his letter "on the strength of these subscriptions, think we could have sold another 100,000 shares." Defendant Custer replied to this letter under date of June 26, 1963. He returned checks amounting to $10,050.00, describing them as the checks "I talked with you about * * * which cannot be accepted by this Corporation." Defendant Custer stated that he was retaining Mr. Wallace's personal check in the amount of $3,500.00 and a check of Mr. Cornelson which had been transmitted in the June 22 letter in the amount of $25,000.00. Following these statements, he then instructed Mr. Wallace, "Please handle this matter of the enclosed check as per our phone conversation, along with any additional friends who become part of the Bruce Wallace Associates in one personal check."

Other proof conclusively demonstrates that Mr. Cornelson was one who helped Bruce Wallace solicit subscriptions placed in the name of Bruce Wallace Associates. It is not without significance, therefore, that under dates of August 10, 1964 and September 9, 1964 defendant Custer wrote to Mr. Cornelson, complaining, in the letter of August 10, 1964, that when Mr. Cornelson left Hagerstown, defendant Custer had been under the impression that he was going to supply funds to meet the numerous bills coming due for engineering services for the aircraft, but that Mr. Cornelson had not produced any funds and, further complaining, in the letter of September 9, 1964, that at the directors meeting held August 21, 1964, everyone agreed that defendant Custer should proceed with expenditures to get the aircraft certificated, but that money to meet obligations falling due was not forthcoming. Apparently, the difficulties defendant Custer had with raising money were continuous, because, in an undated memorandum to all directors, which referred to a previous letter under date of April 6, 1964, defendant Custer had written at length about his need for money to continue the program of development of the aircraft, and concluded by saying, "I hope all of you realize this is not a request for any Director to put up any money, it is an urgent appeal for my Directors, as well as myself, to find someone with this money, that will invest with us to help carry this project to a conclusion."

After his letter of June 22, 1963, Mr. Wallace continued to write defendant Custer in terms which unquestionably would make clear to him that Bruce Wallace Associates was a conduit through which stock was purchased by outsiders. Under date of April 16, 1964, Mr. Wallace wrote to transmit an investment letter for 63,800 shares of stock. He stated that he would like to have "several of these certificates for 500 shares each, as I have a few investors who have put in only $150.00 each." By letter dated June 4, 1964 he referred to, "The checks I have sent recently for which no stock has been issued," and suggested that the stock be issued in 1,000 share certificates "with 2 at $100 each for which a man purchased for his 2 sons." In an apparent reference to the total number of shares which were to be forwarded to him as a result of the transactions set out in the letter, Mr. Wallace concluded by saying, "with Maymans [sic] and my stock on hand we can use that to give to *our customers* without waiting for a couple of months to get it * * *." (Emphasis supplied.)

Defendant Custer, and through him Channel Wing, was as much on notice of the true mode of operation of Ward Brooks Associates as the documentary proof shows was the fact in regard to J. Ben Parent Associates and Bruce Wallace Associates. Thus, when defendant Custer wrote Mr. Brooks under date of October 3, 1963 to advise him that stock was authorized to be issued, defendant Custer stated all materials were furnished at The Corporation Trust Company and " * * * the stock certificates for *all your friends* should be coming to you in less than ten days." (Emphasis supplied.)

Should the documentary proof admit of any doubt (which the Court finds it does not) that defendant Custer knew the true nature of the activities of the Associates, there was evidence that defendant Custer referred at least two purchasers to Bruce Wallace Associates to obtain stock.

Charles R. Lancaster, a resident of Sarasota, Florida, appeared as a witness and testified that he met defendant Custer in Hagerstown, Maryland in 1961, and again in 1964. On the latter occasion Lancaster inquired if stock was available, and defendant Custer told him that Bruce Wallace would know if stock was available. Defendant Custer gave Mr. Lancaster Mr. Wallace's address: Youngblood Hotel, Enid, Oklahoma. By letter dated September 9, 1964 Mr. Lancaster wrote and asked if he could obtain stock through Bruce Wallace Associates as suggested to him at a recent meeting with defendant Custer in Hagerstown, Mary-

land. Magnanimously, Mr. Wallace responded that stock could be obtained, that the price had recently been raised to 35¢ per share, but that since Mr. Lancaster had talked to Mr. Custer prior to the raise "we are still going to give you the old price of 25¢ per share." Mr. Wallace also added that the company was making rapid progress and would have complete certification of the aircraft early in 1965, at which time stock would be listed on the "board" at $3.00 per share.

Mr. T. B. Holliday, of Elmhurst, Illinois, also testified. He had been employed as a consultant for Channel Wing in connection with the interest evidenced by the United States Air Force in obtaining information about the plane that Channel Wing hoped to manufacture. Late in 1963, Mr. Holliday inquired of defendant Custer if the former could obtain Channel Wing stock. Mr. Custer "carefully emphasized that he couldn't have anything to do with stock" but gave Mr. Holliday the name of Mr. Sam Stoner and Bruce Wallace Associates. Under date of December 30, 1963, Mr. Holliday wrote to Mr. Stoner asking if he could convert a fee due him from Channel Wing into stock, as well as purchase some additional stock for a check for $200.00 enclosed in his letter. Mr. Stoner replied promptly, stating that he had talked to defendant Custer and that the check and the unpaid fee could be converted into stock. Mr. Stoner indicated that a certificate for the stock would be forthcoming at a future date.

— V —

Other than defendant Custer's denial of his knowledge of essential facts constituting a violation of the injunction in regard to sales to the "Associates," which the Court finds neither convincing nor sufficient to raise a reasonable doubt of the fact of defendant Custer's actual knowledge in this regard, defendant Custer asserts, as a defense, that he was advised by counsel that the overall sales which were made did not amount to a public offering, and that in good faith he relied on such advice. He testified that he was advised by his brother that if an investment letter were used, transfer of the stock restricted, and sales of stock limited to approximately fifteen to twenty people, there would be no public offering of the sale and no violation of the injunction. Defendant Custer's brother died, and was succeeded in the role of adviser to defendant Custer and Channel Wing by Keith L. Seegmiller, Esq., one of Cecil Custer's partners and one of counsel in these proceedings. Mr. Seegmiller advised defendant Custer that sales could not exceed six to eight purchasers in order to comply with the injunction. Other witnesses testified that they had been advised by Cecil Custer in regard to the formation and operation of the "Associates." Consistent with his claim that he knew nothing about the mode of operation of the Associates, defendant Custer offered no testimony on this point, except that he learned about the time these proceedings were instituted that J. Ben Parent had been advised to limit the number of persons subscribing to stock through J. Ben Parent Associates to six to fifteen in number. From this evidentiary basis, defendant Custer asserts that he acted on advice of counsel in good faith.

There are at least two answers to this alleged defense. The first is that, as a factual matter, even treating repeated sales to the "Associates" as no more than sales to three entities and repeated sales to the same individuals as only one sale, defendant Custer did not stay within the advice given him by his brother with regard to the number of purchasers. Rather, with this method of computation, he expressly authorized the sale and issuance of stock to twenty-two persons. The precise date on which defendant Custer was first advised by Mr. Seegmiller is not disclosed in the record, so that it may well be that defendant Custer had authorized sales to persons in number exceeding the maximum advised by Mr. Seegmiller by the time that Mr. Seegmiller first gave such advice, but the record shows that three sales were made in 1965, and it seems

clear from the record that defendant Custer had the advice of Mr. Seegmiller at or shortly after a directors' meeting held in November, 1964. As a fact, the Court finds that defendant Custer, and through him Channel Wing, did not rely in good faith upon any advice of counsel.

The second answer to the alleged defense is that the Court has already found that in the case at bar wilfulness may be proved by showing knowledge of each of the essential elements of the violation and does not require proof of specific intent. Any defense of good faith reliance on advice of counsel has bearing upon only specific intent, and not general intent. Linden v. United States, 254 F.2d 560 (4 Cir. 1958); Miller v. United States, 277 F. 721 (4 Cir. 1921); Bisno v. United States, 299 F.2d 711 (9 Cir. 1961). In a proper case, good faith, or good faith reliance on advice of counsel, is a factor to be considered in mitigation of punishment. Lustgarten v. Felt & Turrant Mfg. Co., 92 F.2d 277 (3 Cir. 1937); In re LaVarre, 48 F.2d 216 (S.D.Ga.1930).

For the reasons stated, the Court finds each of the defendants guilty of criminal contempt as charged.